**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

W. B. WILLIAMS,

              **Plaintiff,**           **CIVIL ACTION NO. 06-CV-15088**

    **vs.**

                               **DISTRICT JUDGE GEORGE CARAM STEEH**

**COMMISSIONER OF**          **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

              **Defendant.**
_____/

**REPORT AND RECOMMENDATION**

**RECOMMENDATION:** This Court recommends that Defendant's Motion For Summary

Judgment be GRANTED and Plaintiff's Motion For Summary Judgment be DENIED, as there is

substantial evidence on the record that Plaintiff has a residual functional capacity which allows him

to perform his past relevant work.

\*\*\*

Plaintiff filed an application for Disability Insurance Benefits on May 21, 2003 alleging that

he had been disabled and unable to work since September 25, 2002 due to major depression with

psychotic features. (TR 47, 57). The Social Security Administration denied benefits. (TR 23). A

requested *de novo* hearing was held on October 26, 2005, before Administrative Law Judge (ALJ)

Charles D. Reite, who subsequently found that the claimant was not entitled to disability benefits

because he retained the ability to perform his past relevant work. (TR 16-21). The Appeals Council

declined to review the ALJ's decision and Plaintiff commenced the instant action for judicial review.

(TR 4). The parties filed Motions For Summary Judgment and the issue for review is whether

Defendant's denial of benefits is supported by substantial evidence on the record.

Plaintiff was fifty-six years old at the time of the administrative hearing, had a high school diploma, and previously worked as a production worker. (TR 17, 58, 63). Plaintiff was employed by General Motors as a production worker with the title "machine operator" or "oiler," which involved, in part, carrying five-gallon pails of oil to machines and filling the machines as needed. (TR 58, 71).

Plaintiff indicated in a Disability Report dated May 19, 2003 that he suffers from major depression with psychotic features. (TR 57). Plaintiff indicated that these impairments first began to bother him on September 26, 2002. (TR 57). He further alleges that he became unable to work on September 26, 2002 due to the depression, psychotic features, bad nerves and "suicidal conditions." (TR 57). Plaintiff states that before the depression he "could do anything" but now he stays at home, away from people, and watches television. (TR 80). He visits his friends and family when he is "able." (TR 96). Plaintiff states that he has no problems with his personal care, however his brother helps him remember to take his medications. (TR 81). Plaintiff indicates that he has no hobbies or interests and only goes outside once in a while. (TR 82, 83). Plaintiff further states that people get on his nerves and that his bosses and other people in authority "upset" him. (TR 85). He cannot concentrate and has trouble finishing tasks he starts because he gets "disinterested." (TR 85).

In the May 2003 Disability Report Plaintiff indicated that he was taking LexaPro, Zyprexa and Geodon for his depression and all of the medications allegedly caused him drowsiness. (TR 62). The record further indicates that Plaintiff has taken Abilify, Lithium, Lamictal, Trazadone, Hydrocodone and Eskalith. (TR 92, 98, 114, 125).

At the Administrative Hearing, Plaintiff testified that his "depression and psychotic problems" keep him from returning to work. (TR 251). He also testified that he gets out to see his

friends and family and goes to recreation places "where people are . . . doing things, sitting and talking." (TR 248-49). Plaintiff also testified that he has a girlfriend. (TR 271). Plaintiff indicated that he is prohibited from working eight hours a day because he is tired and sleepy and it's difficult for him to concentrate on the job. (TR 249). He stated that it's depressing and he's not interested in "jobs." (TR 249). Plaintiff alleges that his problems began to mount when he was commuting from Flint to Romulus for work, a drive of approximately 77 miles each way. (TR 251). Plaintiff further stated that around the same time, his interactions with his supervisors and the people he worked with were really bringing him "down." (TR 251). He testified that he was getting a lot of "threats" from supervisors. (TR 252). He stated that the supervisors were giving him extra jobs that weren't his and threatening to fire him and give him time off from work without pay. (TR 252-53).

In September 2002 Plaintiff stopped going to work. (TR 259). He worked a full night shift and the next day he decided that he did not feel like going to work. (TR 259). He called in to work and asked for sick leave papers, which were sent to him. (TR 260). In October 2002 Plaintiff saw Psychotherapist Elonzo Duncan, MSW, ACSW, the first health-care professional with whom he consulted after leaving his job at General Motors. (TR 253, 260). Plaintiff further testified that General Motors determined that his depression had been caused by his job and therefore it was a worker's compensation matter. (TR 262). Plaintiff received approximately $87,000 in settlement from General Motors for worker's compensation. (TR 262). At the time Plaintiff left his job, he was hearing voices telling him to "do things" to himself, including commit suicide. (TR 263). He heard the voices when he was driving to and from work and sometimes the voices woke him up from his sleep. (TR 263). At the time of the 2005 administrative law hearing Plaintiff testified that he still heard the voices as often as three times a week. (TR 265). However, in 2002, prior to taking

medications, Plaintiff heard the voices everyday. (TR 266). Plaintiff also testified that Dr. Rhyee

suggested that going back to work might help him "out of the depression mood." (TR 272-73).

Plaintiff did not agree with Dr. Rhyee and changed doctors thereafter. (TR 272-73).

**MEDICAL BACKGROUND**

Psychotherapist Elonzo Duncan, MSW, ACSW, treated Plaintiff from October 2002. (TR

234). Plaintiff described his reason for seeking help as "stress from working." (TR 231). Mr.

Duncan's initial primary diagnosis was major depressive disorder and psychotic episode. (TR 234).

The record contains progress notes from Mr. Duncan through September 2005. Mr. Duncan noted

either "marginal" or "little" progress at most of the sessions. (TR 197-232). In a Medical Source

Statement dated October 7, 2005 Mr. Duncan noted that Plaintiff was "moderately limited" in his

ability to relate and interact with supervisors and co-workers, "extremely limited" in his ability to

understand, remember and carry out an extensive variety of technical and/or complex job

instructions, "markedly limited" in his ability to understand, remember and carry out simple one-or-

two step job instructions, "moderately limited" in his ability to deal with the public, "markedly

limited" in his ability to maintain concentration and attention for at least two hour increments,

"extremely limited" in his ability to withstand the stress and pressures associated with an eight-hour

work day and day-to-day work activity, and "not significantly limited" (or "unknown") in his ability

to handle funds. (TR 194).

In December 2002 Plaintiff consulted with S. Nagarkar, M.D., psychiatrist. (TR 102). Dr.

Nagarkar noted that Plaintiff had anhedonia and his energy level was low. (TR 102). He also noted

that Plaintiff had "passive thoughts of suicide but has no plans." (TR 102). Dr. Nagarkar noted that

Plaintiff has initial and middle insomnia, his libido had decreased, and he has problems with

concentration and memory. (TR 102). Dr. Nagarkar reported that Plaintiff was "alert and oriented to all spheres" and Plaintiff's mood "is bland and his affect is constricted." (TR 102). Dr. Nagarkar further reported that Plaintiff's speech was "clear, coherent, and goal directed" and there is a "formal thought disorder noted occasionally vague." (TR 102). Dr. Nagarkar noted psychotic features and auditory hallucinations. (TR 102). Dr. Nagarkar's diagnostic impression was major depression with psychotic features and scizoaffective (sic). (TR 103).

In December 2002, Plaintiff reported to Dr. Nagarkar that the "[v]oices don't come too frequently." (TR 100). In January, Plaintiff reported to Dr. Nagarkar that General Motors sent him back to work, but the plant doctor and labor relations sent him home again. (TR 100). He also reported that he was afraid of driving, so his brother drove him to the January appointment. (TR 100). In January 2003 he had been depressed, the voices were still there, he reported seeing "reflections of people passing by" him and he still had some paranoia. (TR 100). On February 25, 2003, Dr. Nagarkar noted that the "voices have diminished considerably" and the depression is better. (TR 100).

In June 2003 James T.S. Rhyee, M.D., evaluated Plaintiff. (TR 141). Dr. Rhyee noted that the "pertinent clinical symptoms presented at entry included feelings of sadness, emptiness, quick temper outbursts, frequent thinking about "dying", chronic insomnia due to restlessness of legs at nighttime, poor concentration stating that "I'm always in a trance state like in a twilight," due to "too much wandering thoughts," and fear of driving since at least two years ago. (TR 141). Dr. Rhyee noted that it was likely Plaintiff would need additional mood stabilizing medications, "but, regardless, his long term prognosis is deemed excellent." (TR 141).

Mr. Duncan referred Plaintiff to Kang Kwon, M.D., psychiatrist, for evaluation. (TR 183). In January 2004 Plaintiff met with Dr. Kwon for an initial psychiatric evaluation. (TR 183). The records indicate that Plaintiff thereafter continued to meet with Dr. Kwon monthly through February 2005. (TR 158-93). In the initial evaluation, Dr. Kwon gave a diagnostic summary of bipolar disorder. (TR 193). Dr. Kwon's notes spanning 2004 through February 2005 show improvement in Plaintiff's mood. In March 2004 Dr. Kwon noted that Plaintiff's "[m]ood is better," Plaintiff had visited a friend over the weekend and had a good time, sleep was not a real problem and Plaintiff "feels good about being retired." (TR 179). In April 2004 Dr. Kwon noted that the medications were "agreeing" with Plaintiff and that his "motivation is good most of the time." (TR 178). In May 2004 Dr. Kwon noted that Plaintiff "hears voices once in a while" but also noted that "he is not delusional" and Plaintiff "feels good about self." (TR 176). By January 2005 Dr. Kwon noted that Plaintiff's mood was "OK," his sleep was good and he was "healthy." (TR 159).

On October 10, 2005 Dr. Kwon completed a Medical Source Statement indicating that Plaintiff was "moderately limited" in his ability to relate and interact with supervisors and co-workers, "moderately limited" in his ability to understand, remember and carry out an extensive variety of technical and/or complex job instructions, "mildly limited" in his ability to understand, remember and carry out simple one-or-two step job instructions, "mildly limited" in his ability to deal with the public, "moderately limited" in his ability to maintain concentration and attention for at least two hour increments, "markedly limited" in his ability to withstand the stress and pressures associated with an eight-hour work day and day-to-day work activity, and "mildly limited" in his ability to handle funds. (TR 195).

**ADMINISTRATIVE LAW JUDGE'S DETERMINATION**

The ALJ found that although the Plaintiff met the disability insured status requirements, had not engaged in substantial gainful activity since his alleged onset date, and suffered from major depression with psychotic features and schizoaffective disorder, both severe impairments, he did not have an impairment that met or equaled the Listings of Impairments. (TR 20). Additionally, the ALJ found Plaintiff's subjective complaints were not totally credible. The ALJ found that Plaintiff has a residual functional capacity (RFC) for simple repetitive work at the medium exertional level with mild (33% of the time) difficulties in social interaction and moderate (66% of the time) difficulties in maintaining concentration, persistence or pace. (TR 20). The ALJ found that with this RFC, Plaintiff can perform his past relevant work as a production worker and therefore is not suffering from a disability under the Social Security Act. (TR 21).

**STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)); *Walters*, 127 F.3d at 528. It is not the function of the court to try cases *de novo*, or resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Commissioner*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts").

## DISCUSSION AND ANALYSIS

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)     he was not presently engaged in substantial gainful employment; and

(2)     he suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner, at step five, would consider his RFC, age, education and past work experience to determine if he could perform other work. If he could not, he would be deemed disabled. *Id*. § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial

evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

Plaintiff asserts that the VE's testimony in response to the ALJ's hypothetical questions conflicts with her later testimony in Plaintiff's matter. Therefore, Plaintiff reasons, the ALJ erred as a matter of law by finding that Plaintiff is not disabled for purposes of the Social Security Act.

The Commissioner has prescribed rules for evaluating mental impairments. *See* 20 C.F.R. § 404.1520a. The Commissioner first determines whether there is a medically determinable mental impairment. Second, the Commissioner rates the degree of functional limitation resulting from the impairments. The rating is based on four broad functional areas: Activities of daily living, social functioning, concentration, persistence, or pace and episodes of decompensation. *See* 20 C.F.R. § 404.1520a(c)(3). Activities of daily living, social functioning and concentration, persistence and pace are rated on a five-point scale of "none, mild, moderate, marked and extreme." 20 C.F.R. § 404.1520a(c)(4). The fourth functional area, episodes of decompensation, uses a four-point scale: None, one or two, three, four or more." 20 C.F.R. § 404.1520a(c)(4). "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity." 20 C.F.R. § 404.1520a(c)(4).

In applying the factors, the ALJ determined that Plaintiff had major depression with psychotic features and schizoaffective disorder. (TR 20). The ALJ then determined that his

impairments resulted in "no restriction of activities of daily living, mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace with no evidence of episodes of decompensation of extended duration in work or work-like environments." (TR 18). Based on these findings, the ALJ concluded that Plaintiff had severe mental impairments, however, the Plaintiff's mental impairments did not meet or medically equal any listed impairment. (TR 18).

The ALJ then properly determined Plaintiff's RFC. 20 C.F.R. § 404.1520a(d)(3). The ALJ accounted for Plaintiff's mental impairments and found that Plaintiff had a RFC for

> . . . [S]imple repetitive work at the medium exertional level with mild (33% of the time) difficulties in social interaction and moderate (66% of the time) difficulties in maintaining concentration, persistence or pace. This RFC is consistent with the medical evidence. Regarding the exertional limitation, I am giving claimant the considerable benefit of the doubt because the only reference to a physical injury is psychiatric consultative evaluator Forrer's September 2003 reference to a Colle's type right arm fracture at exhibit 3F/2 and 4. In addition, I note that, on the various disability forms, claimant has made no allegation of a physical impairment.

(TR 18).

**The ALJ's Determination of Moderate Impairment Was Based On Substantial Evidence**

The ALJ's determination that Plaintiff had moderate difficulty in maintaining concentration, persistence or pace is supported by substantial evidence in the record. Furthermore, this determination is consistent with treating psychiatrist Dr. Kwon's assessment. (TR 17, 18). To the extent that this determination is inconsistent with other opinions in the record, the ALJ properly addressed the inconsistencies and weight given to those opinions.

The ALJ found Plaintiff's subjective complaints credible "only to the extent that they are consistent with the above RFC for a range of work at the medium exertional level." (TR 20). The

ALJ's conclusions regarding credibility should be accorded deference and should not be discarded lightly because the ALJ has the opportunity to observe the demeanor of a witness. *See Casey v. Sec'y of Health and Human Servs.,* 987 F.2d 1230 (6th Cir. 1993). Where a claimant's credibility is undermined, it is reasonable to question the reliability of a physician's opinion based only on claimant's complaints. *See Brawner v. Sec'y of Health and Human Servs.*, 839 F.2d 432, 434 (9th Cir. 1988).

A finding that a claimant is not credible must be supported by substantial evidence in the same manner as any other ultimate factual determination.

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.
>
> . . . The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.

Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34483, 34485-86 (1996). The assessment must be based on a consideration of all of the evidence in the case record, including

> Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34483, 34485-86 (1996).

Here, the ALJ stated that he evaluated Plaintiff's subjective complaints "pursuant to Social Security Ruling 96-4p and 96-7p and 20 CFR § 404.1529." (TR 19). The ALJ found Plaintiff's allegations "not fully credible." (TR 19). The ALJ's basis for finding Plaintiff was only partially credible was well-grounded in the record and the ALJ articulated its reasons for such a finding by citing specific examples in its decision. (TR 19-20).

The ALJ noted out that Plaintiff did not seek treatment for his complaints until after he left his job at General Motors and applied for disability. (TR 19). The ALJ also noted that Plaintiff told at least two of the doctors that he had suffered from the auditory and visual hallucinations for years, however during most of those years he was able to successfully perform his work. (TR 19). Plaintiff told one of the psychiatric evaluators that he had no problems concentrating. (TR 19). Finally, the ALJ found that Plaintiff's activities of daily living seemed to indicate a greater residual functional capacity than Plaintiff is willing to acknowledge. (TR 20). As a result, the ALJ properly questioned opinions of the treating psychiatrists and evaluators to the extent that they were based on Plaintiff's subjective complaints.

**The ALJ Asked An Accurate Hypothetical Question Of The Vocational Expert And Properly Relied On Her Testimony**

Plaintiff asserts that the VE gave conflicting testimony in response to the ALJ's hypothetical questions and Plaintiff's counsel's questions. Therefore, Plaintiff reasons, the ALJ erred as a matter of law by finding that Plaintiff is not disabled for purposes of the Social Security Act.

Judith Findora, a vocational expert (VE), testified at the hearing. Plaintiff asserts that it was the VE's testimony that "a person needs to be productive or complete their work tasks at least 75

percent of the workday or such an individual would not be capable of employment." Plaintiff's

Motion and Brief at 8. However, Plaintiff is paraphrasing. The ALJ posed four hypothetical

questions to the VE. The hypothetical questions, with responses, were as follows:

> Q: [T]he present hypothetical would be closely approaching advanced age, at almost 50 years of age. And we'll assume that this first hypothetical individual would have a medium exertional capacity, there'd be a mild limitation on his concentration, pace and persistence and a mild limitation on social interaction with coworkers, supervisors and the public. And we'll assume that, to clarify that a little bit, as the agency doesn't necessarily do that, that you assume that the best worker you can imagine, employee of the month or the year would be at 100 percent on task with concentration, pace and persistence during a workday and have no social interaction problems with anybody. We'll assume that the mild limitation would get you down to about an 85 percent with that - - what the next employee would be able to do. Given that hypothetical individual, would there be any of the past work that could be accomplished?

> VE: Yeah. He could do all of it.

> Q: . . . [T]he second hypothetical person I'm going to give you will again be that same age and medium exertional capacity, however, we're going to add, it's going to limited (sic) to simple repetitive tasks, two-step kinds of procedures. How would that affect your assessment of the past relevant work?

> VE: (INAUDIBLE)

> Q: . . . A third hypothetical - - in this case we're going to increase the - - both the concentration, pace and persistence and the social interactive up to a moderate level of impairment, and that would find that to be 66 percent of what the employee of the year would be able to accomplish? How would that affect the past relevant work that has been identified here?

> VE: It would not.

> Q: And in our fourth hypothetical person, now we're going to go to a mark - - excuse me, a marked level impairment on both of those categories and that would - - I would find that to be only 33 percent of what the employee of the year would have the capacity - - would be able to do. How would that affect the past work?

> VE: (INAUDIBLE)

(TR 275-77).

Plaintiff's counsel then questioned the VE as follows:

Q:      Ms. Findora, what's a typical range, as far as percentage of time one need to be able to concentrate or pay attention to a task?

VE:     It's not so much paying attention as it is (INAUDIBLE).

Q:      So, then if the deficiency in concentration resulted in the untimely completion of tasks, greater than - - they need to complete the task at least 75 percent of the time so, if it fell below that, then it would be work (INAUDIBLE)[1].

VE:     Generally.

(TR 277).

Nowhere in the ALJ's questions and the VE's responses did the VE testify that a moderate impairment, even an impairment of 66 percent of what an "employee of the year" would be able to accomplish, would result in an inability to complete the task at least 75 percent of the time.  In fact, the VE responded to the ALJ's questioning that a moderate impairment of 66 percent would not affect the past relevant work.  Plaintiff makes an unsupported leap in reasoning that a 66 percent impairment is equivalent to a quantifiable inability to complete tasks.

Plaintiff seeks to equate "moderate" as used in the current version of 20 C.F.R. § 404.1520a(c)(3) with that of "often" as used under the old version of that regulation (as both terms fall on the same place in a five-point scale) and further suggests that "moderate" means an inability to perform certain tasks 50% of the time.  Plaintiff, relying upon *Bankston v. Comm'r of Soc. Sec.*, 127 F.Supp.2d 820 (E.D. Mich. 2000), suggests that a "moderate" limitation as used in the regulations can be quantified as a specific percentage.  In *Bankston*, the Court found that one who

---

[1]The hearing transcript contains portions characterized as "inaudible."  Plaintiff asserts that upon his questioning of the VE, it was, "in essence" the testimony of the VE "that a person needs to be productive or complete their work tasks at least 75 percent of the workday or such an individual would not be capable of employment."  For purposes of the analysis herein, the Court will assume that Plaintiff has accurately recounted the "inaudible" portions of the hearing tape.

"often" suffers from difficulties in concentration, persistence, or pace, as used in the old regulations, implies a deficiency in concentration that can be quantified as 50% of the time on a linear scale and which may not be consistent with substantial gainful activity. *Id.* at 826-27. However, there is no authority that defines "moderate" as meaning a 50% deficit. *See Butler-Wade v. Comm'r of Soc. Sec.*, 2005 WL 361530 *7-8 (E.D. Mich. 2005).

The language of 20 C.F.R. § 404.1520a and 20 C.F.R., Pt. 404, Subpt. P., App. 1 § 12.00 suggest that a claimant's functional limitations in daily living, social functioning, or concentration/persistence/pace cannot be quantified with mathematical precision. Indeed, the regulations' language specifically notes that an ALJ is not to examine a claimant's ability to perform and complete a certain number of tasks but is rather to assess the nature and overall degree of an impairment's interference with a claimant's overall functioning. *See* 20 C.F.R., Pt. 404, Subpt. P., App. 1 § 12.00(C). The Court further notes that many of the cases which Plaintiff cites in support of reversing or remanding the ALJ's decision were remanded because the ALJ's hypothetical question to the VE neither mentioned nor addressed existing concentration lapses. In the case at bar, the ALJ addressed concentration, persistence and pace in each hypothetical. The ALJ found that Plaintiff has moderate difficulties in maintaining concentration, persistence or pace and he included this limitation in the hypothetical question to the VE. Therefore, the question accurately portrayed Plaintiff's mental impairments. The VE's response regarding a 66 percent impairment was not inconsistent with later questioning regarding an inability to complete tasks more than 75 percent of the time.

Based upon the foregoing, the Court concludes that the ALJ's decision is supported by substantial evidence.

**REVIEW OF REPORT AND RECOMMENDATION**

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: September 27, 2007             s/ Mona K. Majzoub
                                       MONA K. MAJZOUB
                                       UNITED STATES MAGISTRATE JUDGE

## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: September 27, 2007       s/ Lisa C. Bartlett
                                       Courtroom Deputy